### FANNIE L. TURNER v. NORTH CAROLINA PUBLIC SERVICE CORPORATION.

(Filed 7 November, 1917.)

**Municipal Corporations — Cities and Towns — Streets — Electric Railway— Freight—Additional Servitude—Damages.**

> The use of the streets of a city, under legislative authority and charter right given by the municipality, for the transportation of freight in electrically driven cars on street railroad tracks, from a steam-railroad depot to factories, etc., within the city limits, does not impose an additional burden upon the streets for which compensation may be allowed to the owners of lots abutting thereon.

APPEAL by defendants from *Long, J.,* at April Term, 1917, of GUILFORD.

*W. P. Ragan, W. P. Bynum, and King & Kimball for plaintiff.*
*Robertson, Barnhardt & Smith, Peacock & Dalton, and Brooks, Sapp & Kelly for defendants.*

CLARK, C. J. This case was before the Court, 170 N. C., 172. The plaintiff sought to enjoin the defendants from building a street railway, but the restraining order having been dissolved and the work having been completed prior to the hearing of the appeal, the court declined to pass upon the questions involved, further than to hold that the city authorities were authorized to grant, upon reasonable terms, franchises for public utilities; and as to the contention that the "construction of this track, or the running of freight cars upon it, is additional servitude, for which the plaintiff, the abutting owner, claims additional compensation," remitted the case, to have that question and the damages, if any, determined at the final hearing.

Upon the undisputed evidence in the case, the station of the defendant, Carolina & Yadkin Railroad Company, and its freight yards, were

located within the city limits of High Point, and the lines of the North Carolina Public Service Company, including the one complained of, are situated exclusively within the city limits; and the freight cars hauled along the streets were never more than two at a time, and they were carried exclusively between said freight yard and various factories within the limits of the city, said freight exclusively originating in or consigned to these factories within the city of High Point.

The plaintiff contends that this is an additional servitude, for which she, as an abutting owner, is entitled to compensation. If so, every other abutting owner along the lines of these tracks are entitled also to compensation.

The streets of a city are laid out for the accommodation of passengers and traffic between any two points in said city. It is well settled, therefore, that the laying out of a street car line is not an additional servitude, but comes within the very object for which the streets exist. Indeed, they very much lighten the servitude by carrying passengers and freight from point to point within the city by electric or horse power on their rails, which is much less an encumbrance and interference with the use of the streets by others than would be the former method of lines of busses for passengers and horses, wagons and drays for freight. It has therefore, always been held by us that a street car line is not an additional servitude, but a relief. This method of transportation of passengers and goods from point to point in the city is not only a lesser interference with the use of the streets than the former method, but it is more sanitary, and there is much less danger of those crossing the street being run down than by horses attached to drays and other vehicles, which otherwise would be required in great and increasing numbers.

A steam railway passing through a city is an additional burden, not only by reason of the additional danger of fire set out from sparks from the engine, but because it carries through passengers and freight, and is not limited, like this defendant, to moving from a point in the city where the freight and passengers have already arrived, the passengers and freight to another point in the city.

High Point is one of the most progressive and rapidly growing towns in the State. It is said that it is the second city in the Union in the quantity of furniture manufactured. To require the defendant public service company to pay for additional servitude to every abutting owner on the streets along which its lines are operated would make the continued existence and operation of the company impossible. In this case alone the jury has allowed $2,500 damages. If the company was required, in the face of such burdens, to cease business, it would be a great detriment to all dwellers in the city by increasing vastly the number of drays, wagons, and other vehicles drawn by horses, and by the cost of breaking

bulk, in unloading the cars at the railway station and placing the contents in such drays and wagons. The cost of this alone would be a very heavy handicap against the manufacturers of the city, and a heavy ban upon the progress and prosperity of the city.

Before the invention of the electric motor system, in many cities, to save the great expense of breaking bulk at the railway station, horses were attached and the freight cars were drawn over wooden and, later, over iron rails, to and from the factories where they were loaded and unloaded. The use of electric motors for that purpose is speedier and more sanitary, and tends far less to block the streets.

In *Percy v. R. R.,* 113 Me., 106, the Court said: "The doctrine that the grant of power to construct and operate a street railroad along a highway imposes no additional servitude for which the abutting owner is entitled to additional compensation, is not denied by the plaintiff, but it is suggested in argument that the rule is, or ought to be, different when a street railroad company is authorized to transport freight in freight cars, especially in the freight cars of a steam railroad company. We do not think so. The reason given in the *Briggs* and *Taylor cases* why the changed methods of transportation of passengers do not result in an additional servitude apply with equal force to changed methods in transporting property. The right of public travel includes the right to transport property in drays and wagons. To transport it in cars is but another and more modern way of transporting it; so we think the right to haul freight in cars, if the right exists, imposes no additional servitude upon the land in a street over which the railroad runs, and affords no reason for saying that the legislative grant of the right is unconstitutional as impinging upon the constitutional provision which forbids the taking of private property for public use without just compensation."

To same purport, *White v. Granite Co.,* 178 Mass., 363, which says that "A highway is created for the use of the public, not only in view of its necessities and requirements as they then exist, but also in view of the constantly changing modes and conditions of travel and transportation, brought about by improved methods, and required by increase of population and the expansion in the volume of traffic due to the ever-increasing needs of society. . . . For these changing public uses the owner must be presumed to have received compensation when the highway was created." Here the case is more strongly against the plaintiff, for streets are laid out, when the town is built, for the easy movement of persons and goods from one part of the town to the other. An abutting owner is not entitled to any compensation for laying out the street, which is an absolute necessity for his use of his own lot. It is a benefit, and not a burden.

In *Montgomery v. R. R.* (Cal.), 25 L. R. A., 655, the Court held that "A railroad for transportation of passengers and freight on a street does not impose a new burden of servitude upon the owner of the soil," and adds that it cannot see "why the transportation of freight by modern and improved methods is not equally entitled to encouragement as the transportation of passengers." The Court further observed: "The Appian Way, commenced 312 B. C., which has provoked the admiration of the world, was entitled to commendation for its roadway, 16 feet, while the paths of 8 feet on each side of it for foot passengers, and upon which the Roman legions marched, were unpaved." The Court denied that the transportation of freight from one point to another within the city added an additional burden on the abutting owner. It cannot be, says the Court, that "An interminable string of heavy drays may thunder through the streets from early morning until set of sun, a menace to all who frequent the thoroughfare, and an inconvenience to all dwellers thereon, but that the cars of a railway, which move usually but a few times in a day, and with infinitely less annoyance to the public, upon tracks so adjusted to the service as to occasion little or no inconvenience, cannot be tolerated," adding that all methods for the transportation of passengers and freight made necessary by modern developments must have been contemplated when the street was opened, and even methods not yet discovered, and hence such user imposes no new burden upon the owner of the abutting land.

Lewis Em. Dom. (3d Ed.), sec. 166, says that the operation of express cars on the street railway tracks is a legitimate use of the streets, and adds: "When we direct our attention to a moving freight car taking the place of 20 drays, 20 pairs of horses and 20 drivers, the advantage of such use of a street seems obvious. It is presumably more economical. It saves wear and tear of the street, diminishes the accumulation of dirt and filth, relieves the congestion, and diminishes the noise and confusion. The movement of the freight car would no more interfere with abutting property than the movement of a passenger car. To the extent that the freight car is a substitute for traffic teams on the street, it tends to make the street quieter, cleaner, freer and more sanitary, and since the street exists as much for the movement of freight as for the movement of persons, there seems to be no reason why the street freight car should not be put upon the same basis as the street passenger car, in so far as it concerns the mere movement of the car on the tracks, and in so far as it carries freight which would otherwise be carried in vehicles on the street."

In *Kipp v. Copper Co.,* 41 Mont., 509, the Court goes very fully into this matter, and holds: "The rights of the abutting owner bear exactly the same relation to the inconveniences which are incident to the tracks

installed for the movement of passenger cars and the movement of cars thereon as they do to the inconveniences which arise from the conveyance of freight by the same means." And says that the freight cars do not obstruct access to the property of the abutting owner any more than the movement of passenger cars or the hauling of the same freight in drays and wagons. To the same purport, *Modehurst v. Traction Co.* (Ind.), 66 L. R. A., 105.

The city of High Point has obtained from the Legislature express authority to permit the defendant company to haul freight over its lines within the city limits, and by its ordinance has directly conferred this power upon the defendant, which is now exercising it.

In *S. v. Rice,* 158 N. C., 639, the Court says: "Even if this Court was of the opinion that the ordinance is not sound public policy and meant hardship, we could not declare it invalid. An appeal in such case must be to the law-making power."

The enterprising city of High Point has taken every step needful to establish competition and improve service in the handling of freight originating within its limits. The Southern Railway Company runs its double-track railway through the heart of the city and at one time enjoyed a monopoly of all incoming and outgoing freight. The city, acting through the vote of its citizens, has made possible the use of its streets in carrying freight and cars rather than in drays, thus avoiding the expense of breaking bulk and establishing effective competition; and by using in this way the station of a competing railway it has destroyed the freight monopoly heretofore existing. It has been well said: "The law of the public streets of a city is declared to be motion. Any use of the street, though a new one, which does not materially abridge or obstruct the right of passage and repassage, or ingress or egress, and to light and air, of the abutting owner, gives no cause of action."

In *Morris v. R. R.,* 10 N. J. Eq., 352, it is said: "The easement of the highway is in the public, although the fee is technically in the adjacent owner. It is the easement only which is appropriated, and no right or title of the owner is interfered with."

In our own Court, in *Hester v. Traction Co.,* 138, N. C., 291, it is said: "The authorities with singular uniformity concur that it is now well settled that the use of the streets in cities and villages for a street railway is one of the ordinary purposes for which such streets and highways may be used, and does not impose an additional burden of servitude, so as to entitle the abutting property owner, as a matter of right, to compensation before such use can be made. This rule is generally recognized, irrespective of the question whether in the original laying out of the street a mere easement was taken, leaving the fee simple in the abutting property." Citation to this effect could be indefinitely prolonged.

*Kirkpatrick v. Traction Co.,* 170 N. C., 477, is relied on by the plaintiff. That case held that a street railway is not an additional burden, but that an ordinary steam railroad in the streets of a town is such, and that where a railway, though operated by electricity, engages in hauling freight over its line in trains of several freight cars, baggage and mail cars, such as is used by a steam railroad, with incidental noises and inconveniences which would attend the operation of the steam railway, it would be an additional servitude. In that case the defendant's line of railroad, though operated by electricity, ran from Gastonia to Charlotte, carrying freight trains and passenger trains, between those two points and intermediate points. Such trains consisted of several cars and were used in the streets of the city, not for the purposes for which such streets were laid out, for moving freight and persons from one part of the city to another, but were used for the transportation of freight and passengers on a through line. This increased vastly the volume of business, and used the streets for a purpose not intended, and, of course, was an additional servitude. That case is no authority against the use of the streets of High Point, under an act of the Legislature and by authority of an ordinance, which facilitates the movement of freight from the railroad station in the town limits to the doors of the factories in the city, or from the factories to the railroad station, saving the expense of breaking bulk and minimizing the pressure upon the streets by eliminating the drays, trucks, wagons, and horses which otherwise would have been necessary. By economizing in the costs of manufacture, this aids the town to compete with other centers in the same line of business. The resulting economy in the pressure of traffic upon the use of the streets cannot be any additional servitude or burden upon the abutting owners along the streets.

When two or more common carriers unite in transporting an article as a through line, they are *quoad hoc* partners, and either can be sued for any loss or damage. *Mills v. R. R.,* 119 N. C., 693. But this does not apply to damages or burdens to right of way under rights of eminent domain, for each company is responsible for its own right of way only.

We need not discuss the other assignments of error, for we think that upon the evidence the court should have sustained the motion to nonsuit the plaintiff.

Reversed.

WALKER, J., not sitting.